IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

MAYOR AND CITY COUNCIL OF BALTIMORE, Plaintiff - Appellee,

v.

BP, P.L.C., *et al.*, Defendants - Appellants,

---

Appeal from the United States District Court for the District of Maryland, No. 1:18-cv-02357-ELH (The Honorable Ellen L. Hollander)

---

## BRIEF OF THE NATIONAL LEAGUE OF CITIES; THE U.S. CONFERENCE OF MAYORS; AND THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE

---

Robert S Peck
CENTER FOR CONSTITUTIONAL
 LITIGATION, P.C.
2117 Leroy Place, N.W.
Washington, DC 20008
Phone: (202) 944-2874
Fax: (646) 365-3382
robert.peck@cclfirm.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the National League of Cities, the U.S. Conference of Mayors, and the International Municipal Lawyers Association ("Local Government *Amici*"), by and through their undersigned attorney, hereby certify that they each have no parent corporation and that no publicly held corporation owns 10% or more of any of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................. i

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF IDENTIFICATION ...................................... 1

SUMMARY OF ARGUMENT ..................................................... 5

ARGUMENT

    I.    STATE AND LOCAL GOVERNMENT
        PLAINTIFFS HAVE THE SAME RIGHTS
        ENJOYED BY OTHER PLAINTIFFS TO
        TAILOR THEIR COMPLAINTS TO THE
        ISSUES THEY SEEK TO LITIGATE. ..................... 6

    II.   THERE IS NO FEDERAL COMMON-LAW
        BASIS TO REMOVE THIS MATTER TO
        FEDERAL COURT ................................................. 12

CONCLUSION ......................................................................... 20

CERTIFICATE OF SERVICE.................................................. 21

CERTIFICATE OF COMPLIANCE......................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Am. Elec. Power, Co. v. Connecticut*, 564 U.S. 410 (2011) ...................... 15

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ........................... 19

*Blue Ink, Ltd. v. Two Farms, Inc.*, 96 A.3d 810 (Md. 2014) ................... 8

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987) .................................... 6

*City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126
  (Ill. Ct. App. 2005) ................................................................. 10

*City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136
  (Ohio 2002) ............................................................................ 9

*City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222 (Ind. 2003) ...... 9

*City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ........................... 14, 15

*City of Milwaukee v. NL Indus.*, 762 N.W.2d 757 (Wis. Ct. App. 2008). 10

*City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021) . 17, 18, 20

*City of Oakland v. BP P.L.C.*, 960 F.3d 570 (9th Cir.), *amended &
  superseded on denial of reh'g,* 969 F.3d 895 (9th Cir. 2020), *cert.
  denied*, 2021 WL 2405350 (Jun. 14, 2021) ........................................... 16

*City of Portland v. Monsanto Co.*, 2017 WL 4236583
  (D. Or. Sept. 22, 2017) ........................................................ 11

*City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110
  (Mo. 2007) ............................................................................ 10

*Cleveland v. Ameriquest*, 621 F. Supp. 2d 513 (N.D. Ohio 2009)...........11

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996) .............................19

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1 (1983) ...............................................................................20

*Hart v. Wagner,* 40 A.2d 47 (Md. 1944) ...................................................8

*Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.,* 535 U.S. 826 (2002) ................................................................................................14

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) .......................18

*In re Lead Paint Litig.*, 924 A.2d 484 (N.J. Sup. Ct. 2007) ....................10

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013) .....................................................................................10

*In re Otter Tail Power Co.*, 116 F.3d 1207 (8th Cir. 1997) .....................13

*In re: National Prescription Opiate Litigation*, 1:17-MD-2804 (N.D. Ohio Dec. 8, 2017) .....................................................................11

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ..............................14, 15

*Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685 (6th Cir. 2015).......15

*Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469 (1876)................19

*N.Y. Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 85 N.E.2d 873 (1949) ........................................................................................8

*New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953 (9th Cir. 1996).........14

*People v. ConAgra Grocery Prod. Co.*, 227 Cal. Rptr. 3d 499 (Ct. App. 2017), *reh'g denied* (Dec. 6, 2017), *rev. denied* (Feb. 14, 2018), *cert. denied sub nom. ConAgra Grocery Prod. Co. v. California*, 139 S.Ct. 377 (2018), and *cert. denied sub nom. Sherwin-Williams Co. v. California*, 139 S.Ct. 378 (2018) ............................................................ 10

*Rodriguez v. F.D.I.C.*, 140 S.Ct. 713 (2020) ............................................ 13

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ...................................... 18

*State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008) ..................... 10

*State v. Purdue Pharma LP*, No. CJ 2017-816
   (Okl. Dist. Aug. 26, 2019) ................................................................... 11

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) ........ 13

*Wheeldin v. Wheeler*, 373 U.S. 647 (1963) ............................................. 13

*White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816
   (N.D. Ohio 2000) ............................................................................. 9-10

**Statutes**

42 U.S.C. § 7401 ....................................................................................... 16

42 U.S.C. § 7543 ....................................................................................... 17

**Other Authorities**

2 M. Keely *et al.*, *Ch. 11: Built Environment, Urban System, and Cities* in Impacts, Risks, and Adaptation in the United States: The Fourth National Climate Assessment (D.R. Reidmiller *et al.* eds., 2018)......... 3

Sarah L. Swan, *Plaintiff Cities*, 71 Vand. L. Rev. 1227 (2017) ............... 9

W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts (5th ed. 1984) ........................................................................ 18

William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966) .................................................................... 7

# STATEMENT OF IDENTIFICATION[1]

Local Government *Amici* comprise three of the nation's leading local government associations. The National League of Cities (NLC) is the oldest and largest organization representing municipal governments throughout the United States. Its mission is to strengthen and promote cities as centers of opportunity, leadership, and governance. Working in partnership with forty-nine State municipal leagues, NLC serves as a national advocate for more than 19,000 cities and towns, representing more than 218 million Americans. Its Sustainable Cities Institute serves as a resource hub for climate change mitigation and adaptation for cities.

The U.S. Conference of Mayors (USCM) is the official non-partisan organization of U.S. cities with a population of more than 30,000 people (approximately 1,400 cities in total). USCM is home to the Mayors

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* state that no party's counsel authored this brief, and no party, party's counsel, or person other than *amici* or its members or counsel contributed financial support intended to fund the preparation or submission of this brief.

Climate Protection Center, formed to assist with implementation of the Mayors Climate Protection Agreement.

The International Municipal Lawyers Association (IMLA) is a nonprofit, nonpartisan professional organization consisting of more than 2,500 members. The membership is composed of local government entities, including cities and counties, and subdivisions thereof, as represented by their chief legal officers, state municipal leagues, and individual attorneys. IMLA serves as an international clearinghouse of legal information and cooperation on municipal legal matters. Established in 1935, IMLA is the oldest and largest association of attorneys representing United States municipalities, counties, and special districts.

More than eighty percent of Americans now live in urban areas, and even more of them work there; as a consequence, Local Government *Amici*'s members are responsible for understanding the risks to and planning for the wellbeing of the great majority of Americans. The concentration of people, activity, and infrastructure in cities makes them uniquely valuable economically. It also serves to compound the adverse impacts of a host of climatic changes, including sea-level rise;

increasingly frequent and severe storms that pose immediate threats to human life and critical infrastructure; damaged and disappearing coastlines; degraded ecosystems and reduced ecosystem services function; increases in heat-related deaths; poor air quality and exacerbated health problems; longer droughts that combine with increased temperatures and water evaporation rates to strain water supplies; and heightened wildfire risk. *See* 2 M. Keely et al., *Ch. 11: Built Environment, Urban System, and Cities* in Impacts, Risks, and Adaptation in the United States: The Fourth National Climate Assessment 444–47 (D.R. Reidmiller *et al.* eds., 2018).

Local Government *Amici* have a unique interest in the Court's proper recognition of state-court jurisdiction over state law claims for injuries arising from climate change consequences – or any other issue in which state and local governments, as plaintiffs, seek to adjudicate state law claims. The district court properly found that it lacked subject-matter jurisdiction over Plaintiff's state law claims. Judicial conversion of a variety of well-pleaded state law claims into vaguely defined federal common law claims, and the exercise of federal jurisdiction over them that Defendants seek, would threaten to

fundamentally intrude upon municipal governments' authority within our federalist system to rely on state law and state courts to seek redress for localized harms. In a contemporary world defined by complex economic and environmental systems that transcend multiple borders, even conduct arising in part outside a municipality nonetheless can cause highly damaging local impacts that are subject to state law.

The district court's decision in this case is fully consistent with essential federalism principles and recognizes the right of state and local governments to bring state-law claims for climate change harms in state courts. Local Government *Amici* respectfully urge this Court to affirm the district court's decision to remand for lack of subject-matter jurisdiction and sustain the viability of Plaintiff's state law claims.

Local Government *Amici* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. All parties to the appeal have consented to the filing of this brief.

# SUMMARY OF ARGUMENT

State and local government plaintiffs, no less than other plaintiffs, are entitled to be the master of their claims and have a right to plead purely state-law claims to assure that their case is heard in state court. Doing so is not artful pleading, but a straightforward application of the well-pleaded complaint rule.

Nor does it detract from state and local governments' right to try their state-law claims in state court that the cause of action may implicate cross-jurisdictional issues. Cities have joined states in litigating a wide variety of concerns, from asbestos and tobacco health issues to pharmaceutical and chemical disputes that affect the health of their residents and their own livability. So long as the cases seek to vindicate state law, as here, there is no purchase to turn them into federal-law issues.

This is particularly true when the basis for removal is the very limited and narrow category of federal common law. Federal courts do not possess the same plenary common-law authority that state courts retain, but only that which is inherently federal or authorized by Congress. Here, there is no congressional authorization for the Court to

declare federal common law or exercise jurisdiction. Moreover, Congress has affirmatively eliminated the former federal common-law aspects of the environmental issues raised here, displacing them with the Clean Air Act, which does not completely preempt the field but leaves ample room for the state-law claims advanced by Baltimore. In that respect, the Clean Air Act maintains the federal-state balance that is central to our constitutional system. This commitment to federalism recognizes the authority of state courts to decide whether ordinary preemption applies to any of the State's claims. This Court should affirm the district court's order to remand further proceedings to state court.

## ARGUMENT

### I. STATE AND LOCAL GOVERNMENT PLAINTIFFS HAVE THE SAME RIGHTS ENJOYED BY OTHER PLAINTIFFS TO TAILOR THEIR COMPLAINTS TO THE ISSUES THEY SEEK TO LITIGATE.

The "well-pleaded complaint" rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Under the rule, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id*.

Here, Baltimore's complaint is inarguably based on state law. It asserts public nuisance, trespass, products liability, and consumer protection causes of action. That the plaintiff here is a city government does not alter the inquiry. The recognition that plaintiffs are masters of their claim applies with full force to state and local government plaintiffs, as it does to all other plaintiffs. The state-law obligations that are the basis of this lawsuit provide an important means for state and local governments to seek abatement of and damages for localized harms arising from commercial activities, even if they cross jurisdictional boundaries, as well as justice for their most vulnerable residents suffering those harms.

State and local governments have, for instance, long employed state public nuisance law to address conduct offensive to the community, from environmental pollution to red-light districts, as an exercise of their inherent and reserved police power. *See* William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966) (tracing the history of public nuisance). As the New York Court of Appeals noted some 80 years ago, in a statement emblematic of conditions nationwide:

[W]here the public health is involved, the right of the town to bring such an action to restrain a public nuisance may be tantamount to its right of survival… [I]t is clear that a public nuisance which injures the health of the citizens of a municipality imperils the very existence of that municipality as a governmental unit. The right to exist necessarily implies the right to take such steps as are essential to protect existence.

*N.Y. Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 84, 85 N.E.2d 873, 877-78 (1949). *Cf. Hart v. Wagner,* 40 A.2d 47, 50 (Md. 1944) ("the term 'nuisance' in legal parlance extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency or obstructs the reasonable and comfortable use of property.") (citation omitted); *Blue Ink, Ltd. v. Two Farms, Inc.*, 96 A.3d 810, 820 (Md. 2014) ("Nuisance is not confined to physical intrusions onto another's property; rather, it broadly encompasses all tangible invasions, including noise, odor, and light.). Other state laws, particularly where the public health is at issue, deserve no lesser respect.

In the long history of public nuisance litigation, courts have always played a crucial role, balancing competing interests to determine where there has been an "unreasonable interference" with a public right. State and federal legislation addressing particular social problems has undoubtedly reduced the domain of public nuisance and

similar doctrines, but it has not eliminated it. The same narrowing of cognizable claims has occurred for other tort, product liability, and trespass actions. Indeed, these causes of action continue to play a vital role for cities, allowing cities to play a *parens patriae*-like role on behalf of their residents and offering an opportunity to hold private actors accountable for harms that result from their tortious failure to warn and wrongful promotion of dangerous products.

Cities' modern use of state-law claims, in both state and federal courts, to address cross-jurisdictional issues began more than three decades ago, when cities joined state attorneys general litigating asbestos and tobacco claims. *See* Sarah L. Swan, *Plaintiff Cities*, 71 Vand. L. Rev. 1227, 1233 (2017). In the mid-1990s, cities again sought to protect their residents by suing the gun industry, invoking state public nuisance, among other claims. *See, e.g., City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1227 (Ind. 2003) (upholding claims for public nuisance, negligent sale, negligent design, and misleading and deceptive advertising); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) (upholding claims for public nuisance, negligence, negligent design, and failure to warn); *White v. Smith &*

*Wesson Corp.*, 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000) (allowing public nuisance and negligent design claims).

A decade later, cities pursued state public nuisance, tort, and product liability claims to abate the harms caused by the gasoline additive MTBE and by lead paint. *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013); *People v. ConAgra Grocery Prod. Co.*, 227 Cal. Rptr. 3d 499, 598 (Ct. App. 2017), *reh'g denied* (Dec. 6, 2017), *rev. denied* (Feb. 14, 2018), *cert. denied sub nom. ConAgra Grocery Prod. Co. v. California*, 139 S.Ct. 377 (2018), and *cert. denied sub nom. Sherwin-Williams Co. v. California*, 139 S.Ct. 378 (2018); *City of Milwaukee v. NL Indus.*, 762 N.W.2d 757, 770 (Wis. Ct. App. 2008); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 458 (R.I. 2008); *In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. Sup. Ct. 2007); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 140 (Ill. Ct. App. 2005).

In recent years, cities have brought similar cases against financial institutions for the consequences of the subprime mortgage crisis, against pharmaceutical companies to help carry the costs needed to

address the opioid epidemic, and against Monsanto to compensate for harms from Polychlorinated Biphenyl (PCB) contamination. *See, e.g., Cleveland v. Ameriquest*, 621 F. Supp. 2d 513, 536 (N.D. Ohio 2009); *In re: National Prescription Opiate Litigation*, 1:17-MD-2804 (N.D. Ohio Dec. 8, 2017); *City of Portland v. Monsanto Co.*, 2017 WL 4236583 (D. Or. Sept. 22, 2017). *See also State v. Purdue Pharma LP*, No. CJ 2017-816 (Okl. Dist. Aug. 26, 2019) (finding pharmaceutical company liable for public nuisance where false and misleading statements caused opioid epidemic).

All these cases involved claims under state law, and none saw a state-law claim judicially converted into a federal common-law claim, much less converted into a federal claim for subject-matter jurisdiction purposes, only to then find the federal claim displaced by a federal statute, as Defendants seek to do here.

There is no reason to treat this case differently from the efforts described above. Baltimore has pleaded very traditional state law claims based on defendants' misrepresentations that fossil fuel products were not hazardous to the planet when it knew better, as well as public nuisance and related claims. None of these are federal causes of action.

This is not a case about regulating greenhouse gas emissions anywhere, controlling federal fossil fuel leasing programs on public lands, or dictating foreign governments' climate policies or energy regimes. This case raises textbook claims under state law, seeking to allocate fairly a portion of the significant costs required to protect state residents from harms inflicted by Defendants' campaign of deception, wrongful promotion of their dangerous products, and creation of a public nuisance.

Defendants' claims about a need for uniformity across the nation might or might not be desirable public policy, but it is neither necessary nor mandated by federal law. A judicial endorsement of that approach would have extraordinary implications for how federal policy is formulated. The decision to remand by the district court should be upheld.

## II.  THERE IS NO FEDERAL COMMON-LAW BASIS TO REMOVE THIS MATTER TO FEDERAL COURT.

Defendants assert that the central allegations of Baltimore's complaint are matters of federal common law, but the assertion is more imaginative than real and would disrupt the federal-state balance that guides jurisdictional decisions.

The Supreme Court has instructed that "[j]udicial lawmaking in the form of federal common law plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States." *Rodriguez v. F.D.IC.*, 140 S.Ct. 713, 717 (2020). For that reason, the "instances where [federal courts] have created federal common law are few and restricted." *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963).

Unlike state courts, federal courts have limited authority to declare the common law, "absent some congressional authorization to formulate substantive rules of decision." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). That authority generally exists with respect to the "rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations,[2] and admiralty cases." *Id.* (footnotes omitted). It also exists in instances where inherent tribal sovereignty is at issue, *In re Otter Tail Power Co.*, 116 F.3d 1207, 1214-15 (8th Cir. 1997), or where government contract matters impinge on

---

[2] In cordoning off these disputes, the Supreme Court observed that "[m]any of these cases arise from interstate water disputes." *Texas Indus.*, 451 U.S. at 641 n.13.

national security, *New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 954-55 (9th Cir. 1996). None of these areas of law are implicated by this lawsuit.

Critically, the Supreme Court has noted that recognition of these areas as displacing state law and state-court jurisdiction has no adverse effect on federalism, because, where federal common law applies, there is little risk of intruding upon the "independence of state governments," as those areas necessarily fall outside state authority. *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.,* 535 U.S. 826, 832 (2002). Therefore, "[i]f state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981).

There was a time when interstate water pollution was the subject of federal common law, but that ended when Congress enacted the Clean Water Act and supplanted that body of judge-made law. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487-90 (1987) (describing the judicial and legislative history). The Court in *Ouellette* explained that

state public nuisance laws remain a valid basis for lawsuits seeking to abate cross-border pollution. *Id.* at 498-99.

The same pattern of prior federal common law being supplanted by statute occurred with respect to interstate air pollution. In *Am. Elec. Power, Co. v. Connecticut ("AEP")*, 564 U.S. 410, 424 (2011), the Court explained that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement" of emissions. For that reason, "'the need for such an unusual exercise of law-making by federal courts [has] disappear[ed].'" *Id.* at 423 (quoting *City of Milwaukee*, 451 U.S. at 314). Now, as a function of the Clean Air Act, a federalism-friendly regulatory scheme exists.

Because federal statutory law displaced federal common law, the only relevant question becomes one of ordinary preemption. *See City of Milwaukee*, 451 U.S. at 327-29; *see also AEP*, 564 U.S. at 429 ("In light of our holding that the Clean Air Act displaces federal common law, the availability vel non of a state lawsuit depends, inter alia, on the preemptive effect of the federal Act."); *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 690 (6th Cir. 2015).

If there had been any doubt, Congress, in passing the Clean Air Act, declared that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). It further declared that a "primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention." *Id.* at § 7401(c). That type of cooperative federalism does not inhibit actions like the one brought here by Baltimore. And, it does not force state and local government to wait for federal action that has not been forthcoming before it undertakes its own initiatives.

Against an array of federal decisions that similar state law claims "do[ ] not arise under federal law," *see, e.g., City of Oakland v. BP P.L.C.*, 960 F.3d 570, 575 (9th Cir.), *amended & superseded on denial of reh'g,* 969 F.3d 895 (9th Cir. 2020), *cert. denied*, 2021 WL 2405350 (Jun. 14, 2021), the Second Circuit recently found that federal common law did apply to a local government's public nuisance claim against fossil

fuel companies for climate-related harms. However, that court denied that its decision was incompatible with the seemingly contrary decisions of sister circuits and district courts because *New York filed its case in federal court* and the issue before them was not federal removal. *City of New York v. Chevron Corp.*, 993 F.3d 81, 94 (2d Cir. 2021). Based on the city's invocation of federal subject-matter jurisdiction from the outset, the Second Circuit deemed itself "free to consider the Producers' preemption defense on its own terms, not under the heightened standard unique to the removability inquiry." *Id*. That explanation suggests that the Second Circuit would remand if it were in this Court's shoes.

Tellingly, on the preemption issue, the Second Circuit agreed that New York was not "seeking to impose a standard of care or emission restrictions on the Producers." *Id*. at 93. If it had, the lawsuit would have run into express preemption. *See* 42 U.S.C. § 7543(a). However, the court then equated New York's prayer for damages caused by fossil fuel emissions to constitute something "even more ambitious," ascribing to the damages request liability for emissions "no matter where in the

world those emissions were released (or who released them). *City of New York*, 993 F.3d at 93.

The court should not have projected damages to a global pool of emissions sources. Still, even if proper, it should not have been fatal to the expansive cause of action imagined by the court. Defendants would still only be responsible for harm proximately caused by them. A proximate cause must only be "substantial enough and close enough to the harm to be recognized by law, [and] a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004). *See also* W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts § 41, at 268 (5th ed. 1984) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that *he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present*." (emphasis added)). Proximate cause provides a tool through which causation is not stretched to the breaking point while assuring that liability is consonant with "what justice demands." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

The question of whether and which emissions caused the harm New York alleged should not have been resolved by the Second Circuit as it did, through projection, but instead is properly an issue reserved for the factfinder. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996). *See also Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 474 (1876) ("the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.")

In addition, lawsuits regularly name defendants who are not found liable, assert causes of action that do not succeed, and plead damages that may be, in part, denied. Doing so is not a bar to a lawsuit because courts have ample tools to assure that damages are the product of appropriate evidence, rather than an overreach or speculation. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

In this case, though, there is no warrant to speculate on liability outside the four corners of what is pleaded. When cabined to the actual pleadings, there can be no preemption of the type the Second Circuit speculated might exist because federal law does not address either climate change adaptation damages or Defendants' product design and

marketing activities. In addition, because "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption," *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 14 (1983), any other issues of preemption must be committed to state-court determination, *see id.* at 7, as even the Second Circuit acknowledged. *See City of New York*, 993 F.3d at 94-95.

## CONCLUSION

For the foregoing reasons, Local Government *Amici* urge this Court to affirm the district court's Order Granting Motions to Remand.

Dated:  September 14, 2021  Respectfully submitted,


s/ *Robert S. Peck*

Robert S. Peck
CENTER FOR CONSTITUTIONAL
  LITIGATION, P.C.
2117 Leroy Place, N.W.
Washington, DC 20008
Tel. (202) 944-2874
robert.peck@cclfirm.com

# CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: September 14, 2021               *s/ Robert S. Peck*

                                        Robert S. Peck

                                        *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 3773 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: September 14, 2021                    s/ *Robert S. Peck*

                                             Robert S. Peck
                                             *Counsel for Amici Curiae*